1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JAMES KEVIN PITTS,

                              Petitioner,

        v.

WARDEN GLEBE,

                              Respondent.

No. C09-5713 FDB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  May 28, 2010**

        This case has been referred to United States Magistrate Judge Karen L. Strombom pursuant to Title 28 U.S.C. § 636 (b) (1) and Local MJR 3 and 4.    Petitioner James Kevin Pitts filed a federal habeas petition pursuant to 28 U.S.C. § 2254.  Dkt. 1.  Respondent filed an answer and submitted relevant portions of the state court record.  Dkts. 13 and 14.  Mr. Pitts filed a response to the answer.  Dkt. 15.

        Having carefully considered the parties' filings and the record relevant to the grounds raised in the petition, the undersigned recommends that Mr. Pitts's petition for habeas relief be denied and this action dismissed with prejudice.

**STATEMENT OF THE CASE**

**A.      Statement of Facts**

        Mr. Pitts is custody for his conviction of first degree murder.  Dkt. 14, Exh. 1.  The facts in Mr. Pitts's case were summarized by the Washington Court of Appeals as follows:

REPORT AND RECOMMENDATION - 1

Pitts served as a staff sergeant in the Army's 864th Engineers Battalion. He served in Iraq from March 2003 until February 2004. During that time he began an adulterous affair with a soldier in his squad, Jackie Besio. The relationship continued when they returned home.

On the Friday before Easter, Pitts spent the night with Besio at her apartment. The next day they drove to Seattle with Besio's daughter and Pitts's son, [J]. All four spent the night at a motel in Sea-Tac. The next morning Tara called Besio's cellular telephone and asked Pitts to bring [J] home. After taking [J] home, Besio and Pitts returned to the motel.

Tara called again that night to tell Pitts that she had found love letters from Besio in his car and had given them to his military supervisors. Worried about the effect an adultery investigation could have on his remaining time in the army, Pitts flew home to Ohio without leave. He also stated that he went to Ohio rather than kill Tara, because she was trying to "burn" him. 21 Report of Proceedings (RP) at 1314. He called Besio six or seven times while he was in Ohio. When Tara tried to reach him in Ohio, he referred to her calls as "[h]ounding me constantly, constantly, constantly." Clerk's Papers (CP) at 99. His brother also overheard Pitts tell Tara on the phone that he should kill her for reporting his affair to the military.

After four or five days, Pitts came to believe that he could work out his differences with his wife and he flew home. The first few days together they were happy, but soon Tara began acting smug and they argued about the affair. That night, a neighbor heard Pitts yelling angrily at Tara and Tara crying.

When Pitts woke up on April 21, 2004, Tara was already up. He asked her why [J] did not kiss him that morning when he left for school. Tara kept asking him about his affair with Besio. She told Pitts that she could not forgive him or trust him. Pitts decided to take a bath and relax. Tara followed him into the bathroom and continued to talk about the situation until Pitts proposed they have sex. She agreed and they had sex in the bathroom. Then he grabbed her head and pushed it into the bathtub, holding it under water until she stopped kicking.

Pitts took Tara out of the bathtub and put her in the bed. He unsuccessfully tried to revive her. He went upstairs to arrange for a neighbor to intercept [J] on his way home from school. Pitts also saw [J] at school and gave him candy, telling him that he would be going away for a few days. At some point, Pitts called Besio from his apartment and asked her to come by for one last kiss.

Pitts then left the apartment and went to a convenience store to buy an 18-pack of beer. He drove to the Fort Lewis bowling alley and drank 13 bottles of

REPORT AND RECOMMENDATION - 2

beer while sitting in the car.  Inside the bowling alley he bought a pitcher of beer and drank about half of it.

Around three in the afternoon, Pitts called First Sergeant Mario Powers from the bowling alley and confessed to killing his wife, saying that he intended to turn himself in to the military police.  Several agents from the Army's criminal investigations division (CID) arrested Pitts at the bowling alley.  The CID agents did not give him *Miranda* warnings.  *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).  They transported Pitts to the CID office, where they asked him general background questions and then transferred him to the Lakewood precinct of the Pierce County Sheriff's Department about an hour later.

While in the CID office, one of the agents smelled alcohol on Pitts.  During his contact with the CID agents, Pitts remained calm and coherent, not appearing to be under the influence of alcohol.  He did not stumble while he walked or slur his words.  Powers also told a police officer that Pitts sounded sober when he called.

When Pitts arrived at the Lakewood precinct, Detectives John Jimenez and Richard Hall took him to an interview room and read him his *Miranda* warnings.  Pitts initialed and signed an advisement of rights form and agreed to answer questions.  The detectives interviewed Pitts for almost three hours, and Pitts told them about the affair with Besio, the events leading up to the killing, and the killing itself.  After the initial interview, Pitts agreed to give a taped statement.  The interview concluded around 8:30 p.m.

Jimenez and Hall testified that throughout the interview, Pitts did not appear to be under the influence of alcohol because he did not smell of intoxicants, did not have bloodshot or watery eyes, did not slur his words, and remained coherent and coordinated.  Based on Pitts's statements about how much alcohol he had consumed that day, Hall suggested that they test Pitts's blood alcohol level.  The results revealed Pitts's blood alcohol level was .13 between 9 and 10 p.m., more than four hours after the interview began.

The State charged Pitts with first degree murder.  He moved to exclude his statements to Hall and Jimenez on the grounds that he was too intoxicated to voluntarily waive his *Miranda* rights.  Finding that Pitts made a knowing, voluntary, and intelligent waiver of his *Miranda* rights, the trial court ruled that his statements were admissible.

Early in the trial proceedings, the trial court informed the parties that the security officers would no longer transport in-custody defendants in public hallways without restraints.  As a result, Pitts would be handcuffed until he was physically in the courtroom.  The trial court stated that the judicial assistant would verify that the jurors were in the jury room while Pitts was being transported.

REPORT AND RECOMMENDATION - 3

Nevertheless, when the prospective jurors were asked to leave the room during voir dire, one of the jurors speculated aloud that it was because they could not see the defendant being brought in in handcuffs.  Pitts moved to strike the entire venire, and the trial court denied the motion.

After trial testimony commenced, a corrections officer misunderstood where the jurors would be during a recess.  As a result, when he escorted Pitts back to the courtroom from the restroom, some of the jurors saw Pitts in handcuffs.  Pitts moved for a mistrial and the trial court denied the motion.  Although both the State and the trial court suggested giving a curative instruction to the jury, Pitts refused.

Dkt. 14, Exh. 2, pp. 1-4.

**B.    Procedural History**

Mr. Pitts appealed to the Washington Court of Appeals.  Dkt. 14, Exh. 3.  The court affirmed Mr. Pitts's judgment and sentence and denied Mr. Pitts's motion for reconsideration.  *Id.*, Exhs. 2 and 5.  Mr. Pitts sought review by the Washington Supreme Court.  *Id.*, Exh. 7.  The Washington Supreme Court denied review on February 5, 2008.  *Id.*, Exh. 8.

In June 2008, Mr. Pitts filed a habeas corpus petition in this court, challenging his custody under the state court judgment and sentence imposed for his conviction of first degree murder.  *See* Dkt. 14, Exh. 10 (Docket, *Pitts v. MacDonald*, USDC Cause No. C08-5386 FDB/KLS).  This court determined the petition was a "mixed petition" because Mr. Pitts had not yet properly exhausted all of his claims.  *Id.*, Exh. 11.  At Mr. Pitts's request, the court dismissed the 2008 petition without prejudice so that Mr. Pitts could attempt to exhaust his claims in state court.  *Id.*, Exh. 12.

In January 2009, Mr. Pitts filed a personal restraint petition in the Washington Court of Appeals.  *Id.*, Exh. 13.  The petition challenged the admissibility of Mr. Pitts's statements. The Washington Court of Appeals dismissed the petition, finding the claim to be frivolous.  *Id.*, Exh. 16.  Mr. Pitts then sought review by the Washington Supreme Court.  *Id.*, Exh. 17.  The

REPORT AND RECOMMENDATION - 4

Washington Supreme Court denied review on November 9, 2009.  *Id.*, Exh. 18.  The

Washington Court of Appeals issued a certificate of finality on December 28, 2009.  *Id.*, Exh. 19.

### ISSUES FOR FEDERAL HABEAS REVIEW

Mr. Pitts presents the following issues for federal habeas review:

1)      Did Pitts' Company Sgt. (Sgt. Powers), the Criminal Investigation
        Department (CID), and state police violate Pitts' due process of law, and
        Miranda rights by admittedly not mirandizing Pitts, even after arresting
        him, questioning him for over 2 hours (while he was in custody), and
        obtaining an illegal non-mirandized "alleged" confession while Pitts was a
        .21 BAC and out of his senses?

2)      Were the Petitioner['] s constitutional rights to a fair and impartial jury
        violated by the viewing of the petitioner in handcuffs by 3 jurors (25% of
        the jury vote) and knowledge of Pitts being lead to and from jail to the
        court house in handcuffs escorted by 2 armed corrections officers,
        especially when Pitts' defense was diminished capacity which is "fragile"
        against the presumption of innocence?

3)      Did the above errors when combined together result in cumulative error,
        violation Mr. Pitts['s] 5th, 6th and 14th Amendments [Rights] to due
        process and [a] fair trial?

Dkt. 2, p. 1.

### EXHAUSTION

Respondent concedes that Mr. Pitts properly exhausted his state court remedies by

fairly presenting his three claims to the Washington courts as federal claims.  Dkt. 13,

p. 6.

### EVIDENTIARY HEARING

The decision to hold a hearing is committed to the court's discretion.  *Williams v.

Woodford*, 306 F.3d 665, 688 (9th Cir. 2002).    State court findings are presumptively correct in

federal habeas corpus proceedings, placing the burden squarely on the petitioner to rebut the

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  In deciding whether to

REPORT AND RECOMMENDATION - 5

grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007). Because the deferential standards prescribed by § 2254 of the Antiterrorism and Effective Death Penalty Act (AEDPA) control whether to grant habeas relief, a federal court must taken into account those standards in deciding whether an evidentiary hearing is appropriate. *Id*.

An evidentiary hearing is not required where the petition raises solely questions of law or where the issues may be resolved on the basis of the state court record. *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998). The petitioner must demonstrate that an evidentiary hearing would materially advance his claims and explain why the record before the court, or an expanded record, is inadequate for review. *Totten*, 137 F.3d at 1176-77; see also Rule 8 of the Rules Governing 2254 Cases. It is not the duty of the state court to ensure that the petitioner develops the factual record supporting a claim. *Lambert v. Blodgett*, 393 F.3d 943, 969 n.16 (9th Cir. 2004) (citing *McKenzie v. McCormick*, 27 F.3d 1415, 1419 (9th Cir. 1994)); see also *Baja v. DuCharme*, 187 F.3d 1075, 1079 (9th Cir. 1999); *In re Rice*, 118 Wash.2d 876, 884, 828 P.2d 1086, cert. denied, 506 U.S. 958 (1992).

The court finds that an evidentiary hearing is not required because Mr. Pitts's habeas claims are matters that can be resolved by reference to the state court record. His habeas claims raise purely issues of law, rather than factual disputes, and therefore, an evidentiary hearing to resolve questions of fact, is not necessary.

## STANDARD OF REVIEW

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension. *Engle v. Isaac*, 456 U.S. 107 (1983). Pursuant to the federal habeas

REPORT AND RECOMMENDATION - 6

statute for state convictions, a federal court may entertain an application for writ of habeas

corpus "only on the ground that [the petitioner] is in custody in violation of the constitution or

law or treaties of the United States." § 2254(a)(1995). The Supreme Court has repeatedly held

that federal habeas corpus relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S.

62 (1991); *Lewis v. Jeffers*, 497 U.S. 764 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

In a habeas corpus petition, the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA) establishes the district court's standard of review of the state court's decision. *Barker*

*v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Under AEDPA, a federal court cannot grant a

writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits in

state court unless the state court's adjudication of the claim:

     (1)    resulted in a decision that was contrary to, or involved an unreasonable
             application of, clearly established Federal law, as determined by the
             Supreme Court of the United States; or

     (2)    resulted in a decision that was based on an unreasonable determination of
             the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA standard of review "demands that state-court decisions be given the benefit

of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

Under 28 U.S.C. § 2254(d)(1), a state court decision is "contrary to" the Supreme Court's

"clearly established precedent if the state court applies a rule that contradicts the governing law

set forth" in the Supreme Court's cases. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision also is contrary to the

Supreme Court's clearly established precedent "if the state court confronts a set of facts that are

REPORT AND RECOMMENDATION - 7

1  materially indistinguishable from a decision" of the Supreme Court, "and nevertheless arrives at

2  a result different from" that precedent.  *Id.*

3      A state court decision can involve an "unreasonable application" of the Supreme Court's

4  clearly established precedent in the following two ways: (1) the state court "identifies the correct

5  governing legal rule" from the Supreme Court's cases, "but unreasonably applies it to the facts"

6  of the petitioner's case; or (2) the state court "unreasonably extends a legal principle" from the

7  Supreme Court's precedent "to a new context where it should not apply or unreasonably refuses

8  to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.

9  However, "[t]he 'unreasonable application' clause requires the state court decision to be more

10  than incorrect or erroneous."  *Lockyer*, 538 U.S. at 75.  That is, "[t]he state court's application of

11  clearly established law must be objectively unreasonable."  *Id.*

12      Under 28 U.S.C. § 2254(d)(2), a federal petition for writ of *habeas corpus* also may be

13  granted "if a material factual finding of the state court reflects 'an unreasonable determination of

14  the facts in light of the evidence presented in the State court proceeding.'"  *Juan H. v. Allen*, 408

15  F.3d 1262, 1270 n.8 (9th Cir. 2005) (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)).  As noted

16  above, however, "[a] determination of a factual issue made by a State court shall be presumed to

17  be correct," and the petitioner has "the burden of rebutting the presumption of correctness by

18  clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## DISCUSSION

### First Claim - Admissibility of Confessions

      Mr. Pitts argues that his confession was inadmissible because his company sergeant, Sgt.

Powers, CID agents, and the state police violated his due process rights by failing to provide him

REPORT AND RECOMMENDATION - 8

with *Miranda* warnings, even after he was arrested, questioned for two hours, and while he was "out of his senses" with a .21 BAC.  Dkt. 2, p. 5.

Over the course of several days the trial court conducted a suppression hearing and heard testimony from several witnesses concerning Mr. Pitts's use of alcohol and the admissibility of his statements to the police.  Dkt. 14, Exh. 20, pp. 29-114; Exh. 21, pp. 334-68; Exh. 22, pp. 379-406; Exh. 31, pp. 97-230; Exh. 33, pp. 243-259.  After hearing the testimony, the trial judge determined the statements were voluntary and that Mr. Pitts's alcohol intoxication was not sufficient to render the statements inadmissible.  *Id.*, Exh. 33, pp. 267-269 and 283-286.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  This privilege is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Malloy v. Hogan*, 378 U.S. 1 (1964).  Although the Fifth Amendment privilege is applicable to the States, the focus in determining the admissibility of a confession in state court criminal proceedings is the Due Process Clause.  *Colorado v. Connelly*, 479 U.S. 157, 163 (1986); *Miller v. Fenton*, 474 U.S. 104, 110 (1985); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978).   "[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."  *Miller v. Fenton*, 474 U.S. at 109.

The Supreme Court has established procedural safeguards that require police to advise a criminal suspect of his rights, under the Fifth and Fourteenth Amendments, prior to commencing a custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  However, the police are required to inform the person of these rights, commonly referred to as *Miranda* warnings, only

REPORT AND RECOMMENDATION - 9

when a person is subjected to custodial interrogation by government officials.  *Thompson v. Keohane*, 516 U.S. 99, 102 (1995).

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Thompson*, 516 U.S. at 107 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).  A person is not in custody for purposes of *Miranda* if there is no "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495).  The procedural safeguards of *Miranda* applies only to the potentially coercive, "police-dominated atmosphere" of custodial interrogations.  *Id*. at 296.

Once the suspect is advised of his *Miranda* rights, the police may interrogate the suspect, without the presence of an attorney, if the suspect voluntarily, knowingly and intelligently waives his rights.  *Id*. at 444.  "[T]he question of waiver must be determined 'on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A waiver is knowing and intelligent if it is "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran*, 475 U.S. at 421.  "[A] state trial court's determination that a defendant knowingly and intelligently waived his *Miranda* rights is entitled to a presumption of correctness pursuant to section 2254(d)."  *Derrick v. Peterson*, 924 F.2d 813, 823 (9th Cir. 1990).  "The ultimate issue of 'voluntariness' is a legal

REPORT AND RECOMMENDATION - 10

question requiring independent factual determination." *Miller*, 474 U.S. at 110.  But a state

court's factual determinations underlying the issue of voluntariness are presumed correct.

*Miller*, 474 U.S. at 112.  "[A]n issue does not lose its factual character merely because its

resolution is dispositive of the ultimate constitutional question."  *Id*. at 113.

In determining whether a confession was voluntary the Court must consider whether,

"the government obtained the statement by physical or psychological coercion or by improper

inducement so that the suspect's will was overborne."  *Derrick v. Peterson,* 924 F.2d at 817.

Whether a confession is voluntary within the meaning of the Due Process Clause "turns as much

on whether the techniques for extracting the statements, as applied to this suspect, are compatible

with a system that presumes innocence and assures that a conviction will not be secured by

inquisitorial means as on whether the defendant's will was in fact overborne."  *Miller*, 474 U.S.

at 116 (emphasis in original).

A necessary predicate to finding a confession involuntary is the "crucial element" of

overreaching, coercive activity by the police that is causally related to the confession.  *Connelly*,

479 U.S. at 163-64 & n.1. The defendant's mental condition is relevant to determining his

susceptibility to police coercion, but mental deficiencies alone in the absence of police coercion

do not render a confession involuntary.  *Connelly*, 479 U.S. at 165; *Derrick*, 924 F.2d at 818.

Absent coercive police misconduct, there is simply no basis for concluding that a confession was

involuntary in violation of the fourteenth amendment.  *Connelly*, 479 U.S. at 167.  The fact that a

suspect is "groggy" or under the influence of alcohol or drugs will not necessarily render a

confession involuntary.  *See Pollard*, 290 F.3d at 1034-36; *United States v. George*, 987 F.2d

1428, 1430-31 (9th Cir. 1993); *Medeiros v. Shimoda*, 889 F.2d 819, 823 (1989); *United States v.*

*Martin*, 781 F.2d 671, 673-74 (9th Cir. 1985).  Similarly, "a 'defendant's mental state alone does

REPORT AND RECOMMENDATION - 11

not make a statement involuntary.'"  *Pollard*, 290 F.3d at 1034 (quoting *United States v. Orso*,

266 F.3d 1030, 1039 (9th Cir. 2001) (en banc)) (other citations omitted).

**1.      Telephonic Statements to Sgt. Powers**

Mr. Pitts first alleges that when he called Sgt. Powers from the bowling alley and told

him that he killed his wife, Sgt. Powers should have read Mr. Pitts his *Miranda* rights.   Mr. Pitts

further argues that "Sgt. Powers was in charge of a company in Pitts' battalion" and "knew Pitts'

was A.W.O.L., and needed to be arrested, and solicited an alleged non *Mirandized* confession

from Pitts." Dkt. 2, p. 14.

In rejecting this argument, the Washington Court of Appeals stated:

> Pitts called Sergeant Powers from a bowling alley and "confessed to
> killing his wife, saying that he intended to turn himself in to the military police."
> *State v. Pitts*, noted at 137 Wn. App. 1005 (February 7, 2007).  CID agents
> arrested Pitts, but did not give him *Miranda* warnings.  They transported him to
> the CID office, asked him general background questions, and then transferred him
> to the Pierce County Sheriff's Department.  There, detectives read him *Miranda*
> warnings and took his confession.  On direct appeal, we held that Pitts's
> confession to the detectives was voluntary, but we did not address the
> admissibility of his statements to Powers or CID and did not discuss the
> exclusionary rule.
>
>                                            . . .
>
> Pitts fails to demonstrate facts that would entitled him to relief.  He asserts
> that Sergeant Powers did not give him *Miranda* warnings, but these warnings are
> required only if the suspect is in custody and is being interrogated.  *Miranda v.*
> *Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  Pitts
> does not allege, and as a matter of law the facts do not support, a finding that
> Powers [sic] was in custody when he called Powers from a bowling alley and
> confessed to killing his wife.  After the CID arrested Pitts, he was apparently in
> custody and we indicated in our direct appeal opinion that CID did not give
> *Miranda* warnings to him.  But we also stated that CID elicited only "background
> information" from Pitts and he does not contend that CID interrogated him or that
> he gave any incriminating statements at that time.  *Pitts*, noted at 137 Wn. App.
> 1005.  In light of the deficiency of factual allegations to support this petition, we
> dismiss this frivolous petition on the merits.

REPORT AND RECOMMENDATION - 12

Dkt. 14, Exh. 16, pp. 1-3.

In denying review, the Washington Supreme Court agreed that Mr. Pitts failed to show a *Miranda* violation because he had not been subjected to custodial interrogation either by Sgt. Powers or the CID investigators:

> Mr. Pitts contends that his conviction must be reversed because he was not advised by Sergeant Mario Powers and Army criminal investigators of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). But *Miranda* warnings apply only to custodial interrogations. *Id*. at 444-45. Mr. Pitts spontaneously called Sergeant Powers from a bowling alley and told him that he killed his wife. There was no custodial interrogation.
>
> As to the military investigators, Mr. Pitts is correct that he was not given *Miranda* warnings when the investigators initially detained him. But those investigators did not elicit any incriminating information, asking only limited background questions before handing Mr. Pitts over to the county sheriff's office. At the sheriff's office detectives read Mr. Pitts his *Miranda* rights, obtained his waiver, and took a detailed confession. The admissibility of that confession was affirmed in Mr. Pitts's direct appeal.

Dkt. 14, Exh. 18, pp. 1-2.

Mr. Pitts argues that Sgt. Powers should have informed him of his Article 31 UCMJ rights, or *Miranda* rights but instead, Sgt. Powers illegally elicited incriminating information from Mr. Pitts. Dkt. 2, p. 8.

There is no evidence that Mr. Pitts was in custody or subjected to an interrogation when he spontaneously telephoned Sgt. Powers from a bowling alley and told him that he killed his wife. There is no evidence that there was an active criminal investigation ongoing and in fact, no evidence that anyone knew that Tara Pitts had been murdered prior to the defendant's phone call to Sgt. Powers. There was no custodial interrogation, even if there was a possibility that Mr. Pitts was going to say something that could result in a criminal charge and jail time. In addition, whether Sgt. Powers knew that Mr. Pitts was absent without leave at the time and "needed to be

REPORT AND RECOMMENDATION - 13

arrested," the evidence reflects that Mr. Pitts had not been arrested and was not in custody.  As noted above, custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Thompson*, 516 U.S. at 107 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).  A person is not in custody for purposes of *Miranda* if there is no "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495).

Mr. Pitts was not subjected to custodial interrogation during the phone call, which he himself initiated and which he could have terminated at any time.  Under these facts, no *Miranda* warning was necessary.  See *Saleh v. Fleming*, 512 F.3d 548, 552 (9th Cir. 2008).  Mr. Pitts was not entitled to the protections of *Miranda* because he was speaking to his first sergeant, not the police or any other government agent.  See e.g., *Arizona v. Mauro*, 481 U.S. 520, 528-29, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).  Moreover, the telephonic statements were not coerced.  A coerced confession is one in which, under "the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)).  The evidence in this case is undisputed that Mr. Pitts voluntarily made the telephone call and spontaneously made the statements.  There is no evidence that his will was overborne.

Thus, the state courts did not commit constitutional error in concluding that Mr. Pitts's telephonic statements were admissible and the undersigned recommends that Mr. Pitts's claim for habeas relief on this claim be DENIED.

REPORT AND RECOMMENDATION - 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**2.      Statements to Army CID Investigators**

There is also no evidence that Mr. Pitts was interrogated by the Army CID investigators while he was in their custody.  Instead, the evidence reflects that the Army CID investigators took only background information from Mr. Pitts before they turned him over to civilian authorities.  Although it is undisputed that Mr. Pitts was "in custody" after he was arrested by the Army CID investigators, the obligation to administer *Miranda* warnings attaches once a person is subject to "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).   Not every question asked in a custodial setting constitutes interrogation. *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir.2006) (citing *U.S. v. Booth*, 669 F.2d 1231, 1237 (9th Cir.1982)).  "[I]nterrogation means questioning or 'its functional equivalent,' including 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Pope v. Zenon*, 69 F.3d 1018, 1023 (9th Cir.1995) (quoting *Innis*, 446 U.S. 291 at 301, 100 S.Ct. 1682, 64 L.Ed.2d 297).      Whether custodial questioning constitutes custodial interrogation is an objective inquiry, and the subjective intent of the police, though relevant, is not determinative because the focus is on the defendant's perception.  *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir.2006) (citation omitted).  "This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police."  *Innis*, 446 U.S. at 301.  Thus, the fact that a question is objective, or was not asked in an attempt to elicit evidence of crime, is insufficient for finding that the questioning is not an interrogation.  *Booth*, 669 F.2d at 1238. "Even a relatively innocuous question may, in light of the unusual susceptibility of a particular subject, be reasonably likely to elicit an incriminating

REPORT AND RECOMMENDATION - 15

response." *Id.* (citing *Innis*, 446 U.S. at 302 n. 8); see also *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir.1993).  Ultimately "[t]he test is whether, under all the circumstances involved in a given case, the questions are 'reasonably likely to elicit an incriminating response from the suspect.'"  *Chen*, 439 F.3d at 1040 (quoting *Innis*, 446 U.S. at 301).

During the time he was in CID temporary custody, he was questioned only as to personal administrative questions to fully identify Mr. Pitts.  Dkt. 14, Exh. 20, p. 70.  He was not given his *Miranda* rights before he was asked background questions by the CID agents as he was in their temporary custody, they were not conducting an investigation, and they intended to release him to the civilian law enforcement agency that would handle the case.  Dkt. 14, Exh. 20, pp. 68-69.

In his investigation report, Special Agent Rasmussen stated that Mr. Pitts also made several spontaneous statements in his presence and in the presence of Special Agents Brannon and Lake, including:   "I know why you're here"; "I will cooperate, just don't let my son go to an orphanage"; "That's capital murder"; "Why is the government letting me go?  They're going to kill me.  They're going to give me the death penalty."  Dkt. 14, Exh. 20, pp. 104-105.  Special Agent Rasmussen also testified that he did not elicit any answers from Mr. Pitts or ask any questions of Mr. Pitts.  Dkt. 14, Exh. 20, p. 109.

Special Agent Kevin Michael Brannon of the CID testified that at the time they approached Mr. Pitts in the bowling alley, no one asked Mr. Pitts any questions.  Dkt. 14, Exh. 31, pp. 105-106.  He also testified that Mr. Pitts was not advised of his Miranda warning because the murder was committed off base and Pierce County had the primary jurisdiction; they were only apprehending Mr. Pitts for public safety reasons.  *Id.*, pp. 106-106.

REPORT AND RECOMMENDATION - 16

The routine gathering of background biographical information does not constitute interrogation for purposes of *Miranda*.  See *United States v. Washington*, 462 F.3d 1124, 1132-33 (9th Cir.2006) (citations omitted).  Several courts have concluded that general questions about background do not constitute "interrogation," and officers can ask such questions even after the defendant invokes his rights to remain silent and to consult an attorney.  See *United States v. Glen-Archila*, 677 F.2d 809, 815 (11th Cir.1982); *United States v. Turner*, 565 F.2d 539, 541 (8th Cir.1977).

The trial court correctly concluded that Mr. Pitts's spontaneous statements to the CID agents were admissible (*i.e.,* "I know why you're here"; "I will cooperate, just don't let my son go to an orphanage"; "That's capital murder"; "Why is the government letting me go?  They're going to kill me.  They're going to give me the death penalty").  Various other courts have concluded that statements made while an officer was collecting background information were admissible because they were spontaneous and unrelated to the questions posed.  See *United States v. Gay*, 774 F.2d 368, 379-80 (10th Cir.1985); *United States v. Suggs*, 755 F.2d 1538, 1541 (11th Cir.1985); *State v. Miner*, 22 Wn. App. 480, 591 P.2d 812 (1979).   In this case, Mr. Pitts offers no persuasive argument that the officer's questions were designed to elicit an incriminating response or that his statements were coerced or involuntary.

Accordingly, the undersigned recommends Mr. Pitts's claim for federal habeas relief on this issue be DENIED.

**3.    Voluntariness of Confession After Miranda**

Mr. Pitts was given his *Miranda* warnings once he was in custody of the Lakewood Police Department.  He disputes, however, the trial court's finding that he voluntarily waived his *Miranda* rights.  He asserts that his intoxicated state prevented him from making a voluntary

REPORT AND RECOMMENDATION - 17

waiver and therefore rendered inadmissible his later confession to the City of Lakewood detectives.  He asserts that because his blood alcohol level was later confirmed to have been over .20 at the time he allegedly waived his *Miranda* rights that the police officer's failure to observe any indication of intoxication is irrelevant and suspect.  Dkt. 2, p. 17.  He further argues that his mental condition at the time must be taken into consideration because he had just returned 63 days earlier from Iraq and was experiencing sleepless nights and extreme anxiety.  Dkt. 15, p. 2.

The Washington Court of Appeals rejected Mr. Pitts's claim that his waiver of *Miranda* rights was involuntary:

> Pitts next argues that the trial court erred in refusing to suppress his statements to Jimenez and Hall because insufficient evidence supported a finding that he voluntarily waived his *Miranda* rights.

> We review a trial court's rulings on the admissibility of evidence for abuse of discretion.  *Powell*, 126 Wn.2d at 258.  A custodial confession is admissible when the defendant is advised of his rights to counsel and to remain silent before interrogation and knowingly, voluntarily, and intelligently waives those rights. *Miranda*, 384 U.S. at 473-75; *State v. Aten*, 130 Wn2d 640, 663, 927 P.2d 210 (1996).  Whether a confession is voluntary depends on the totality of the circumstances under which it was made.  *Aten*, 130 Wn.2d at 663-64. "Intoxication alone does not, as a matter of law, render a defendant's custodial statements involuntary and thus inadmissible."  *State v. Turner*, 31 Wn. App. 843, 845-46, 644 P.2d 1224 (1982).  We do not disturb a trial court's determination that a confession is voluntary on appeal if substantial evidence supports the trial court's finding that the confession was voluntary by a preponderance of the evidence.  *Aten*, 130 Wn.2d at 664.

> When officers do not threaten the defendant or make promises and the defendant is unimpaired, substantial evidence exists on which the trial court could find by a preponderance that the statement was given voluntarily and the waiver was made knowingly and intelligently.  *State v. Alferez*, 37 Wn. App. 508, 510-11, 681 P.2d 859 (1984).  Defensive action is evidence that the defendant was in full possession of his mental faculties during questioning and therefore capable of voluntarily, knowingly, and intelligently waiving his rights.  *State v. Gregory*, 79 Wn.2d 637, 488 P.2d 757 (1971), *overruled on other grounds in State v. Rogers*, 83 Wn.2d 553, 556, 520 P.2d 159 (1974).  But the admissibility of statements made under the influence of intoxicants must be determined on the facts of each case.  *Gregory*, 79 Wn.2d at 642.

REPORT AND RECOMMENDATION - 18

Pitts contends that substantial evidence does not support the trial court's findings of fact that he was coherent throughout his contact with the law enforcement officers; that there was no indication he was impaired; that he was in full possession of his mental faculties; and that his ability to knowingly, intelligently and voluntarily waive his *Miranda* rights was unimpaired.  His argument fails.

Evidence is substantial if it is "'sufficient to persuade a fair-minded rational person of the truth of the finding.'"  *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006) (quoting *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)).  Patrick Rasmussen, a special agent with the United States Army Criminal Investigation Command, and Hall, Olson, and Jimenez all testified that Pitts was calm, coherent, and coordinated.  Only Rasmussen smelled alcohol on Pitts's breath and Pitts did not have watery eyes, slur his words, or display signs of intoxication.  This testimony is sufficient to persuade a rational person that despite consuming alcohol that day, Pitts was coherent, did not appear impaired, was in full possession of his mental faculties, and was capable of knowingly and voluntarily waiving his *Miranda* rights.

Psychiatrist Jerry Larson's testimony does not render this testimony insufficient.  Larson testified that at the time the interview commenced Mr. Pitts's blood alcohol level would have been .2 to .21.  At that level, he opined, a person's ability to exercise critical judgment and comprehend a situation is always impaired.  However, he also conceded that alcohol affects everyone differently and that Pitts had a high tolerance to alcohol.  The trial court was not obligated to accept Larson's expert opinion.  *See State v. Lord*, 117 Wn.2d 829, 854, 822 P.2d 177 (1991) (weight of expert testimony is a matter for the trier of fact); *State v. Toomey*, 38 Wn. App. 831, 837, 690 P.2d 1175 (1984).  The trial court could have reasonably determined that the firsthand accounts of Rasmussen, Hall, Jimenez, and Olson were more credible than Larson's opinion.

The findings adequately support the trial court's conclusion that Pitts voluntarily, knowingly, and intelligently waived his rights.  He signed an advisement of rights form stating that he understood his rights and agreed to waive them.  The detectives did not threaten Pitts or make any promises in exchange for his statement.  Although his blood alcohol level was subsequently tested and found to be elevated, several individuals with whom Pitts came into contact during his arrest did not think he appeared to be intoxicated.  Pitts gave a detailed account of the killing during the tape-recorded interview and was cooperative, matter-of-fact, and articulate.  He was hesitant to give Besio's name to the detectives, and his demeanor changed when he spoke about Besio, as opposed to his wife.  These facts support the trial court's conclusion that Pitts's confession was the product of a rational intellect and free will.  The trial court did

REPORT AND RECOMMENDATION - 19

1   not abuse its discretion in denying his motion to suppress his statements to the

2   detectives.

3   Dkt. 14, Exh. 2, pp. 13-15; and Exh. 6 (Order Amending Opinion and Denying Motion for

4   Reconsideration), pp. 1-2.

5   Once properly advised of his rights, an accused may waive them voluntarily, knowingly

6   and intelligently.  See *id.* at 475.  A valid waiver of Miranda rights depends upon the totality of

7   the circumstances, including the background, experience and conduct of the defendant.  See

8   *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir.1986).  The government has the burden

9   of proving waiver by a preponderance of the evidence.  See *Colorado v. Connelly*, 479 U.S. 157,

10   168-69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Lego v. Twomey*, 404 U.S. 477, 488-89, 92 S.Ct.

11   619, 30 L.Ed.2d 618 (1972); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1180 (9th Cir.1990).  To

12   satisfy its burden, the government must introduce sufficient evidence to establish that under the

13   totality of the circumstances, the defendant was aware of "the nature of the right being

14   abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S.

15   412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

16   Detective John Jimenez of the Pierce County Sheriff's Department testified that he read

17   *Miranda* warnings to Mr. Pitts and that as he read the warnings, Mr. Pitts verbally stated "yes"

18   that he understood his rights and wrote the same answer at the end of each question on the

19   advisement of rights form.  Dkt. 14, Exh. 33, pp. 144-45.  Detective Jimenez testified that Mr.

20   Pitts never invoked his right to remain silent, neither he nor Detective Hall threatened Mr. Pitts

21   or made any promises to Mr. Pitts in return for his statement, and that Mr. Pitts's statement was

22   given freely and voluntarily.  *Id.*, p. 153.  Mr. Pitts also consented to providing a tape recorded

23   statement.  *Id.*, p. 154.

REPORT AND RECOMMENDATION - 20

During the taped interview, Detective Jimenez read Mr. Pitts his *Miranda* rights and Mr. Pitts responded "Yes, sir" each time he was asked whether he understood his rights.  Dkt. 14, Exh. 33, p. 161.  He never asked for an attorney, never invoked his right to remain silent, and was not given any promises in return for his statement by Detectives Jimenez or Hall.  *Id.*, pp. 161-162.  Further, during Detective Jimenez's contact with Mr. Pitts, Mr. Pitts did not appear to be under the influence of alcohol or drugs "at all."  *Id.*, p. 162.

Detective Richard James of the Lakewood Police Department was also present during the questioning of Mr. Pitts and his testimony confirmed that of Detective Jimenez.  Dkt. 14, Exh. 21, pp. 336-347.

Based on the foregoing, the undersigned concludes that there was sufficient evidence to support the trial court's finding that Mr. Pitts voluntarily waived his *Miranda* rights.  In addition to orally indicating that he understood his rights, Mr. Pitts signed a written waiver of those rights.  See *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir.1990) ("The written waiver is particularly strong evidence that the waiver is valid").  It is clear that the detectives did not use "physical or psychological pressure" to elicit the waiver and Mr. Pitts has not otherwise demonstrated "police overreaching."  *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir.2008).

The record also supports the trial court's findings that Mr. Pitts's intoxication did not render his waiver and subsequent statements involuntary or inadmissible.  The U.S. Supreme Court has not explicitly held that a defendant's impairment due to alcohol or drugs renders a statement involuntary.  Rather, the determination as to whether a Miranda waiver is voluntary "has always depended on the absence of police overreaching, not a 'free choice' in any broader sense of the word."  *Connelly,* 479 U.S. at 170.

REPORT AND RECOMMENDATION - 21

In *Connelly* the defendant confessed to a murder.  At the suppression hearing he asserted that his mental illness interfered with his free will and he could therefore not have voluntarily waived his Miranda rights.  The U.S. Supreme Court affirmed that "*Miranda* protects defendants against government coercion leading [defendants] to surrender rights protected by the Fifth Amendment; it goes no further than that."  *Connelly*, 479 U.S. at 170.

In Mr. Pitts's case, the Washington court relied on precedent utilizing the same analysis. (*State v. Alferez*, 37 Wn. App. 508, 510,-11, 581 P.2d 859 (1984) ("[w]hen officers do not threaten the defendant or make promises and the defendant is unimpaired, substantial evidence exists on which the trial court could find by a preponderance that the statement was given voluntarily and the waiver was made knowingly and intelligently"); *State v. Gregory*, 79 W.2d 637, 488 P.2d 757 (1971), *overruled on other grounds in State v. Rogers*, 83 Wn.2d 553, 556, 520 P.2d 159 (1974)("[d]efensive action is evidence that the defendant was in full possession of his mental faculties during questioning and therefore capable of voluntarily, knowingly, and intelligently waiving his rights"), and *State v. Turner*, 31 Wn. App. 843, 845-46, 644 P.2d 1224 (1982) ("[i]ntoxication alone does not, as a matter of law, render a defendant's custodial statements involuntary and thus inadmissible.")).

In its opinion, the Washington Court of Appeals noted that the CID officer and Lakewood Police detectives all testified that Mr. Pitts was calm, coherent and coordinated.  Dkt. 14, Exh. 2, p. 14 and Exh. 6, pp. 1-2.  Only Rasmussen smelled alcohol on Pitts's breath and Pitts did not have watery eyes, slur his words, or display signs of intoxication.  The Washington Court of Appeals also noted that the trial court was not obligated to accept the opinion of Mr. Pitts's expert that his alcohol level at the time of the interview would have been .20 to .21. Rather, the trial court could reasonably have determined that the firsthand accounts of

Rasmussen, Hall, Jimenez, and Olson were more credible. *Id.*, pp. 1-2.  Moreover, the testimony of these individuals was sufficient to persuade a rational person that despite consuming alcohol that day, Pitts was coherent, did not appear impaired, was in full possession of his mental faculties, and was capable of knowingly and voluntarily waiving his *Miranda* rights.  *Id.*

Although Mr. Pitts makes much of the fact that he was intoxicated, the voluntariness of his statement does not depend solely on his intoxication.  Rather, the voluntariness depends on whether the law enforcement officials coerced Mr. Pitts into making a statement.  See *Connelly*, 479 U.S. at 167, 170.  As noted above, there is ample evidence in the record that they did not do so but rather, that Mr. Pitts gave a detailed, cooperative, matter-of-fact, and articulate account of the killing.

The Washington Court of Appeals examined the particular facts and circumstances of the case, including Mr. Pitts's alcohol level, his demeanor during the interview, his detailed and coherent account of the killing, and the lack of threats or promises by the detectives at the scene. Dkt. 14, Exh. 2, pp. 13-15.   Thus, it cannot be said that the state court's standard for evaluating whether Mr. Pitts waived his *Miranda* rights was contrary to clearly established federal law as determined by the Supreme Court.  See 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-03, 120 S.Ct. 1495 (2000).

Furthermore, the Washington Court of Appeal's decision was not an unreasonable application of Supreme Court precedent.  The record amply supports the conclusions of the Washington State courts that Mr. Pitts was fully cognizant of the consequences of his statement when he made them even if he was intoxicated and that the detectives did not threaten him or make any promises in exchange for his statement.  The record reflects that Mr. Pitts was fully

REPORT AND RECOMMENDATION - 23

advised of his *Miranda* rights, he stated that he fully understood those rights, and he signed a written waiver of those rights.

In addition, Mr. Pitts argues that his statement was not voluntary because he had returned from Iraq some 63 days before the murder and was suffering from combat stress.  Dkt. 15, p. 2.

Mr. Pitts is correct that when a court is considering whether a confession is voluntary, a court must consider the totality of the circumstances, including the background, experience, conduct, and mental capacity of the defendant.  *United States v. Garibay*, 143 F.3d 534, 536, 538 (9th Cir.1998).  However, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will.  *Henry v. Kernan*, 197 F.3d 1021 (9th Cir.1999), cert. denied, 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 117 (2000).

The undersigned finds no evidence of police coercion in this case.  There is no evidence of a lengthy sustained interrogation.  There is no evidence that Mr. Pitts's cognitive abilities were impaired so that he could not understand his *Miranda* rights when advised.[1]  As noted above, the state courts also reasonably determined that Mr. Pitts's alcohol consumption and intoxication did not render his statements involuntary or inadmissible.  Because there was no police misconduct, Mr. Pitts's challenge to his statements is without merit and the state court decision denying this claim was not contrary to or an unreasonable application of clearly established federal law.  Accordingly, the undersigned recommends that Mr. Pitts's claim for federal habeas relief on this claim be DENIED

---

[1] The record also reflects that Mr. Pitts does not suffer from post traumatic stress disorder.  See, e.g., Dkt. 14, Exh. 46, pp. 1694-95.

REPORT AND RECOMMENDATION - 24

**Second Claim – Observation by Jurors of Petitioner in Restraints**

Mr. Pitts raised two issues regarding jurors.  The first occurred on April 4, 2005 during the jury panel voir dire and the second occurred on April 6, 2005, after the jury had been seated and some testimony had been presented.

On April 4, 2005, during voir dire, Mr. Pitts moved to disqualify the jury panel because the trial judge commented to the judicial assistant, in the presence of the jury panel members, that the jurors needed to be removed while Mr. Pitts was being escorted in and out of the courtroom.  Dkt. 2, p. 18.  Mr. Pitts' alleges that panel member Juror Number Four then informed the entire jury panel that the reason they had to leave the courtroom whenever Pitts entered or left the courtroom was because Pitts was transported in handcuffs.  Dkt. 14, Exh. 38, p. 524.  However, there was no evidence that any jurors actually saw Pitts in handcuffs during the jury selection process.  *Id.*, p. 526.

Mr. Pitts also alleges that on April 6, 2005, while he was being escorted to the bathroom, two jury members observed him in restraints on his way to the bathroom and two more jury members observed him in restraints on his way back from the bathroom.  *Id.*  With regard to the April 6, 2005, incident, Tim Kavanaugh, a Pierce County Corrections Officer, advised the trial judge that one juror saw the Corrections Officers escorting the defendant, while handcuffed, to the restroom during a break and that two other jurors saw the defendant being escorted back to the courtroom while he was handcuffed.  Dkt. 14, Exh. 40, pp. 847-848.

Kerry Glasgoe-Grant, one of the defendant's attorneys, advised the trial judge that she saw one of the jurors, a man with gray hair that was sitting in the second or third row, who came in behind the officers when they were escorting Mr. Pitts into the courtroom through the side door.  *Id.*, p. 849.

REPORT AND RECOMMENDATION - 25

The trial judge denied Mr. Pitt's motion for a mistrial, concluding the brief and inadvertent observation of Pitts in handcuffs did not cause prejudice.  Dkt. 14, Exh. 40, pp. 847-54.   The trial judge noted that intelligent civic minded individuals sitting on a jury are sophisticated enough to understand that defendants standing trial most often are transported in handcuffs.  *Id.*, p. 853.

The Washington Court of Appeals determined Pitts did not show prejudice from the jurors' brief observation of him outside of the courtroom in handcuffs:

> Pitts first argues that he did not receive a fair trial by an impartial jury because the jury knew that he was being transported to and from the courtroom in handcuffs.  He claims that the jury improperly presumed his dangerousness and likelihood to commit murder, instead of presuming him to be innocent.

> Fairness requires bringing a criminal defendant into the court's presence free from restraints.  *State v. Damon,* 144 Wn.2d 686, 690, 25 P.3d 418, 33 P.3d 735 (2001).  Handcuffing the defendant in the jury's presence may violate his constitutional rights because it suggests to the jury that he is dangerous and not to be trusted.  *Damon,* 144 Wn.2d at 690-91.  This implicates the defendant's constitutional rights to be presumed innocent, to testify on his own behalf, and to confer with counsel during trial.  *State v. Hartzog,* 96 Wn.2d 383, 398, 635 P.2d 694 (1981).  Unless some compelling necessity requires that the defendant to be restrained to secure him in custody and maintain the safety of others, handcuffing the defendant in the presence of the jury violates article I, section 22 of the Washington constitution.  *State v. Finch,* 137 Wn.2d 792, 975 P.2d 967 (1999).

> We evaluate an unconstitutional restraining claim under a harmless error standard.  *Finch*, 137 Wn.2d at 861.  We presume an error violating a constitutional right to be prejudicial, unless it affirmatively appears from the record to be harmless beyond a reasonable doubt.  *Finch*, 137 Wn.2d at 859.  Harmless error may be established when the evidence against the defendant is so overwhelming that no rational conclusion other than guilt can be reached.  *Finch*, 137 Wn.2d at 859.

> But when the jury's view of the defendant in shackles or handcuffs is brief or inadvertent, the defendant must make an affirmative showing of prejudice and carries the burden of curing any defect.  *State v. Elmore*, 139 Wash.2d 250, 273, 985 P.2d 289 (1999).  To demonstrate prejudice, the defendant must show  "'a substantial or injurious effect or influence on the jury's verdict.'"  *Elmore*, 139

REPORT AND RECOMMENDATION - 26

Wn.2d at 274 (quoting *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998)).

Pitts relies on *Damon*, *Finch*, and *Hartzog* to establish that the hallway incident amounts to constitutional error.  He misplaces his reliance because in those cases, the trial court ordered the defendant restrained throughout the entire trial.  *Damon*, 144 Wn.2d at 688; *Finch*, 137 Wn.2d at 804; *Hartzog*, 96 Wn.2d at 387.  Similarly, in both *In the Personal Restraint of Davis*, 152 Wn.2d 647, 676-77, 101 P.3d 1 (2004) and *Finch*, 137 Wn.2d 863, the defendants were visibly shackled throughout the sentencing phase, in which character and future dangerousness were at issue.  These cases are inapposite because they involve a situation where the trial court orders the defendant restrained in the courtroom in the jury's presence.  *See Elmore*, 139 Wn.2d at 275 ("[T]he trial court here did not *order* Elmore shackled during sentencing.").

The constitutional issues at stake in *Davis*, *Damon*, *Finch*, and *Hartzog* are not implicated in this case because Pitts was not restrained throughout the trial as a security measure.  He was not restrained in the courtroom.  Instead, he was briefly seen restrained in the public hallway of the courthouse during a recess.  Because some of the jurors saw him handcuffed only briefly and by accident during the trial outside the courtroom, *Elmore* controls and Pitts must demonstrate prejudice.

Pitts fails to persuasively demonstrate that being briefly seen in handcuffs by a few of the jurors early in the trial influenced the jury's verdict.  *See Damon*, 144 Wn.2d at 692.  In *State v. Clark*, our Supreme Court noted that "it would logically follow that in the minds of the jurors, Clark's handcuffing on the first day of voir dire was more than logically offset by over two weeks of observing Clark in the courtroom without shackles."  143 Wn.2d 731, 776, 24 P.3d 1006 (2001).

Similarly here, only a few of the jurors briefly saw Pitts handcuffed outside of the courtroom near the beginning of a lengthy trial.  Nothing in the record suggests that as a result of this brief encounter, the jury determined that Pitts was dangerous and, therefore, likely to have committed first degree murder.  *See State v. Ollison*, 68 Wn.2d 65, 69, 411 P.2d 419 (1966) ("Beyond the statement of appellants' counsel, the record contains no proof that the incident inflamed or prejudiced the minds of any prospective jurors against appellants.").  Pitts's argument that the entire jury pool was tainted by one juror's speculation that he was being transported in handcuffs does not show prejudice because it is unclear whether anyone who might have overheard the comment was seated on the jury.  As he fails to show prejudice, Pitts's constitutional claim fails.  *See Elmore*, 139 Wn.2d at 274.

Dkt. 2, Exh. 2, pp. 6-8.

REPORT AND RECOMMENDATION - 27

Clearly established federal law tells us that a defendant generally has a right to appear at trial free from restraints.  *Deck v. Missouri*, 544 U.S. 622, 626-29 (2005).  However, the "[c]haining of a prisoner in transport to the courtroom is a different matter" than forcing the defendant to appear before the jury during trial in restraints.  *Castillo v. Stainer*, 983 F.3d 145, 148 (9th Cir. 1992).  The Ninth Circuit has "held that a jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom does not warrant habeas corpus relief unless the petitioner makes an affirmative showing of prejudice."  *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 20040 (citing *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995); *Castillo v. Stainer*, 983 F.2d at 148).

The brief or infrequent glimpse of a defendant being escorted in restraints to or from a courtroom is not inherently or presumptively prejudicial, and the observation by jurors of a handcuffed defendant outside of the courtroom is not reversible error absent a showing of actual prejudice.  *Ghent*, 279 F.3d at 1133.  "No harm that rises to a constitutional level is done by such an unintended, out-of-court occurrence." *Castillo*, 983 F.2d at 148; *see also United States v. Halliburton*, 870 F.2d 557, 559-61 (9th Cir. 1989) (citing cases where brief observance of defendant being transported in handcuffs did not cause actual prejudice).

It is well established federal law that a jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom does not warrant habeas corpus relief absent a showing of prejudice.  See, e.g., *Williams*, 384 F.3d at 593 ("a jury's brief or inadvertent glimpse of a defendant in physical restraints outside of the courtroom does not warrant habeas corpus relief unless the petitioner makes an affirmative showing of prejudice.")  *A fortiori*, the mere

REPORT AND RECOMMENDATION - 28

knowledge that a defendant may be handcuffed when being moved outside the courtroom fails to warrant habeas corpus relief.

The undersigned concludes that the Washington Court of Appeals' determination that Mr. Pitts could not show prejudice from the inadvertent viewing by jurors of Mr. Pitts in restraints was not contrary to or an unreasonable application of clearly established federal law. Accordingly, the undersigned recommends that Mr. Pitts's claim for federal habeas relief on this claim be DENIED.

### Claim Three – Cumulative Error

In this claim, Mr. Pitts alleges that the combination of errors (illegal confession and handcuffing in view of jurors), when considered cumulatively, violate due process.   Dkt. 2, p. 1.

Under the cumulative error doctrine, multiple constitutional errors, even if each one is harmless when considered individually, may serve as a ground for habeas relief if the cumulative effect is to prejudice the petitioner. See *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir.2003); *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir.2002); *Ceja v. Stewart*, 97 F.3d 1246, 1254-55 (9th Cir. 1996).

The Ninth Circuit has determined that it is clearly established Supreme Court precedent that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where no single error considered individually rises to the level of a constitutional violation or would independently warrant reversal.  *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir.2007).  "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' ... and thereby had a 'substantial and injurious effect or influence' on the jury's verdict."  *Parle*, 505 F.3d at 928 (citations omitted).

REPORT AND RECOMMENDATION - 29

The Washington Court of Appeals rejected Mr. Pitts's cumulative error argument:

> Finally, Pitts contends that the cumulative prejudicial effect of trial errors warrants reversal and remand.  Although each error standing alone may be of insufficient gravity to warrant reversal, the combined effect of an accumulation of errors may require a new trial.  *State v. Badda*, 63 Wn.2d 176, 183, 385 P.2d 859 (1963).  Cumulative error does not deprive the defendant of a fair trial when there is no prejudicial error.  *State v. Stevens*, 58 Wn. App. 478, 498, 794 P.2d 38 (1990).
>
> Pitts has not demonstrated that any of the alleged errors were prejudicial such that he was denied a fair trial.  Any defects in the proceeding were promptly cured by the trial court, or were waived when he refused to request a curative instruction.  His cumulative error argument fails.

Dkt. 14, Exh. 2, p. 15.

This court has addressed each of Mr. Pitts's claims and concludes that the alleged errors, even when considered together, did not render his defense "far less persuasive," nor did they have a substantial and injurious effect or influence on the jury's verdict."  See *Parle*, 505 F.3d at 928.  The state court's rejection of Petitioner's cumulative error claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court.  Accordingly, the undersigned recommends that Mr. Pitts's third claim for habeas relief be DENIED.

## CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A COA may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(3).  A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues

REPORT AND RECOMMENDATION - 30

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Based on a thorough review of the record and analysis of the law in this case, the undersigned concludes that Mr. Pitts is not entitled to a COA with respect to any of the claims asserted in his petition because he has not demonstrated that jurists of reason could disagree with the district court's resolution of his constitutional claims or could conclude the issues presented are adequate to deserve encouragement to proceed further.

## WRITTEN OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).

Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **May 28, 2010**, as noted in the caption.

DATED this 6th day of May, 2010.

_s/Karen L. Strombom_____
Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 31